**COLONIAL REALTY CORPORATION,**
Plaintiff,

v.

**BRUNSWICK CORPORATION et al.,**
Defendants.

No. 64 Civ. 110.

United States District Court
S. D. New York.

Aug. 10, 1966.

As Amended Aug. 22, 1966.

Spear & Hill, New York City, for plaintiff.

White & Case, New York City, for defendant Brunswick.

Sullivan & Cromwell, New York City, for defendant Lehman.

Dunnington, Bartholow & Miller, New York City, for defendant Anderson.

## OPINION

EDELSTEIN, District Judge.

This is a motion by defendants for summary judgment on the first count of plaintiff's thirty-nine count complaint. Plaintiff is a corporation which purchased a substantial quantity of the common stock[1] of the defendant Brunswick Corp. The defendants are: Brunswick Corp.; Brunswick's directors and principal officers; sixty-seven brokerage firms which were connected with the underwriting and distribution of Brunswick convertible debentures; together with the accounting firm named in the Brunswick registration statement. Plaintiff's first count, brought expressly to enforce a liability created by Section 11 of the Securities Act of 1933, 48 Stat. 82 (1933), as amended, 15 U.S.C. § 77k (1964), alleges in effect that on January 11, 1961, the defendants offered, through a registration statement, $25,634,400 of convertible subordinated debentures and the common stock issuable upon conversion thereof at a price of approximately $51 per share. The plaintiff further alleges that the registration statement (and the prospectus included therein) contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements not misleading. The principal defect alleged is that the prospectus's consolidated balance sheet, instead of treating a financing agreement with C.I.T. Corporation as a long-term debt and revealing the interest

---

1. The affidavit of Milton E. Selig indicates that he is the secretary and treasurer of the plaintiff corporation and that between May 2, 1961, and April 27, 1962, plaintiff bought 12,300 shares of Brunswick common stock, in the amount of $746,652.28, which shares were subsequently sold for an aggregate sum of $302,823.85. Between May 25, 1961, and August 6, 1962, plaintiff also bought 19,-300 additional shares of Brunswick common for $945,015.28 which it still holds and which at the time this action was commenced was worth approximately $217,125.00.

charges being paid thereon, treated the C.I.T. debt as a current liability and did not reveal the relevant interest charges. These unrevealed interest charges amounted approximately to 10½ percent on an outstanding indebtedness totaling in excess of 126 million dollars. (The consolidated prospectus did include, within the long-term debt category a detailed analysis of the interest charges being paid on other long-term notes totaling less than 11.5 million dollars with interest charges thereon varying between 4% and 5¾%.) The prospectus also allegedly failed to disclose that the rate being paid to C.I.T. was substantially greater than the interest rate being paid for similar credit by Brunswick's major competitor. Plaintiff claims as damages the difference between the price paid for the shares purchased and the amount received for the shares sold (or the market value of the shares retained), which is alleged to be $1,176,710 [2] plus interest, costs and reasonable attorneys' fees.

The following facts relevant to defendants' motion are not in dispute:

1. On January 11, 1961, the relevant registration statement became effective.

2. Only 209 shares of Brunswick common stock were issued on conversion of the debentures subject to the registration statement.

3. Plaintiff never acquired any of the common stock issued upon conversion of the debentures.

Section 11, insofar as relevant, provides:

"(a) in case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, *any person acquiring such security* (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, * * * sue * *." 15 U.S.C. § 77k(a) (1964) (Italics added.)

Plaintiff in effect urges that the permissible class of plaintiffs ("any person acquiring such security") includes persons who acquired a security of the same class as the security issued under the registration statement. Defendants urge that the phrase "such security" refers only to the particular securities registered under the registration statement. Since it is not disputed that the plaintiff did not acquire any of the common stock which were in fact issued on conversion of the registered debentures, plaintiff, it is urged, has no cause of action under Section 11.

■■ It is clear that there is no genuine issue as to any material fact, accordingly if defendants' interpretation of the statute is correct they are entitled to judgment as a matter of law, on the first count of the complaint only. Fed.R.Civ. P. 56(c). See e. g., Fed.R.Civ.P. 56(e); Waldron v. Cities Service Co., 361 F.2d 671 (2d Cir. 1966); Schwartz v. Associated Musicians, 340 F.2d 228, 232–233 (2d Cir. 1964); Dressler v. The M. V. Sandpiper, 331 F.2d 130, 132–33 (2d Cir. 1964).[3]

2. The affidavit of Milton E. Selig referred to in Footnote 1 supra, alleges a purchase of 31,600 shares at an aggregate loss of approximately $1,171,718.00. Par. 19 of plaintiff's complaint alleges, in effect, an aggregate purchase of 30,800 shares and damages in the amount of $1,176,710.00. The reason for this discrepancy is not entirely clear. See note 3, infra.

3. Pursuant to Rule 9(g) the defendants submitted a statement of the facts as to which they contended there was no genuine issue to be tried. Rule 9(g) provides, *inter alia*, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Since the plaintiff did not controvert any of defendants' Rule 9 (g) allegations, the material facts set forth therein are deemed to be admitted. See Fed.R.Civ.P. 56(e). Moreover, on oral argument attorneys for both parties agreed that there was no genuine issue of fact between them. The court has carefully reviewed the entire record and, as to defendants' motion for summary

The Act does not, in terms, define what is meant by "such security." See Section 2, 48 Stat. 74–75 (1933), as amended, 15 U.S.C. § 77b (1964). But Section 6(a), 48 Stat. 78 (1933), as amended, 15 U.S.C. § 77f(a) (1964) provides that "[A] registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered." And Section 6(b), 48 Stat. 78 (1933) as amended, 15 U.S.C. § 77f(b) (1964), as amended, 15 U.S.C. § 77f(b) (Supp. I, 1965) requires a fee of "one-fiftieth of 1 per centum of the maximum aggregate price at which *such securities* are proposed to be offered * * *." (Italics added.) The statutory language leaves little doubt that at least in Section 6 the phrase "such securities" means the securities specified in the registration statement. In the instant case the only common stock registered, at least for the purposes of the calculation of the registration fee under Section 6, was "such indeterminate number of shares of Common Stock as may be issuable upon conversion of the Debentures being registered hereunder." (Defendants' Exhibit "A"—S.E.C. Form S–1 Registration Statement.)

The phrase "such securities" also appears in Subsection (e) of Section 11:

"The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for *the security* (not exceeding the price at which *the security* was offered to the public) and (1) the value *thereof* as of the time such suit was brought, or (2) the price at which *such security* shall have been disposed of in the market before suit, or (3) the price at which *such security* shall have been disposed of after suit * * *." Section 11(e), 15 U.S.C. § 77k(e) (1964) (Italics added.)

Unless it is urged that the phrase "the security" and the phrase "such security" refers to different security lots (and the necessity of determining a mathematical "difference" as well as the underscored "thereof" makes such contention untenable) it seems clear that the phrase "such security" refers only to securities offered to the public under the registration statement. The proviso found in the statute following the above-quoted language confirms such an interpretation.

"Provided, [t]hat if the defendant proves that any portion or all of such damages represents other than the depreciation in value of *such security resulting from such part of the registration statement, with respect to which his liability is asserted* * * * such portion of or all such damages shall not be recoverable." Ibid. (Italics added.)

Plaintiff, in effect, concedes that the phrase "such security" when used in Section 11(e) refers to the particular securities offered to the public under the registration statement, but contends that when used in Section 11(a) the phrase "such security" refers to all securities of the same class as those offered under the registration statement. Such a construc-

---

judgment on Count 1 only, agrees that there is no genuine issue of fact.

If plaintiff's theory concerning Section 11 were to be sustained it appears that plaintiff would be entitled to summary judgment, at least as to defendant Brunswick. The plaintiff's Rule 9(g) statement, however, claims damages in the amount of $1,054,752.30, the amount allegedly lost on a total of 28,100 shares of Brunswick common stock. The difference between this amount and the total of 31,600 shares allegedly purchased (i. e., 3,500 shares) apparently represents purchases between May 7, 1962, and August 6, 1962. Plaintiff does not seek damages as to these 3,500 shares in that recovery would involve proof of reliance, even under Section 11. See note 6 infra and accompanying text. It is not entirely clear why plaintiff has chosen the May 7, 1962, cut-off, since Par. 7 of plaintiff's Rule 9(g) statement concedes that Brunswick issued its annual 1961 report on March 15, 1962. In any event, the result reached on defendants' motion makes it unnecessary to resolve questions relating to the computation of plaintiff's damages.

tion of the statute, while not impossible, is certainly strained.

■ The legislative history of the 1933 Act reveals that the underlying purpose of the Act was "to protect the public with the least possible interference to honest business." S.Rep.No. 47, 73rd Cong., 1st Sess. 6–7 (1933); H.R.Rep.No. 85, 73rd Cong., 1st Sess. 5 (1933). See, e. g., H.R.Rep.No.152, 73rd Cong., 1st Sess. (1933) (Conference Report); Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 172–173 (1933). The Senate House Conference Report, although nominally accepting the Senate bill rejected that portion of the Senate bill which would have placed an insurer's liability on persons responsible for the flotation of a new issue and accepted the House bill's version which increased the number of potential defendants but placed on the defendants only the burden of showing that they had used reasonable care. See H.R. Rep.No.152, 73rd Cong., 1st Sess. 24–29; H.R.Rep.No. 85, 73rd Cong., 1st Sess. 6 (1933). The registration statement's basic importance was seen not only as a source of information to the prospective buyer but also "as a foundation for civil liability." H.R.Rep.No.85, supra at 7.

"Fundamentally, these sections [11 and 12] entitle *the buyer of securities sold upon a registration statement including an untrue statement * * * to* sue for recovery of his purchase price, or for damages not exceeding such price. * * *" H.R.Rep. 85, supra at 9. (Italics added.) See Id. at 7, 15–16; S.Rep.No.47, supra at 6.

A fair reading of the legislative history leads to the conclusion that by the term "such security" Congress meant the securities issued and sold pursuant to the registration statement and not all securities of the same class as those registered.[4]

The cases decided under Section 11 have reached the same conclusion. In Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951) the court held, *inter alia*, that a shareholder's civil action could be maintained under Section 10b of the 1934 Securities Exchange Act. The court rejected the argument that such a civil remedy should not be implied since it would duplicate the remedy provisions of Section 11 of the Securities Act but omit

4. The only legislative history (not cited by either of the parties) which might be construed to cast any doubt on this conclusion appears at pp. 21–22 of H.R.Rep. No. 85, supra:

"Inasmuch as the value of a security may be affected by the information given in the registration statement, irrespective of whether a particular sale takes place in interstate or intrastate commerce, the civil remedies accorded by this subsection against those responsible for a false or misleading statement filed with the Federal Trade Commission are given to all purchasers regardless of whether they bought their securities in an interstate or intrastate transaction and regardless of whether they bought their securities at the time of the original offer or at some later date, provided, of course, that the remedy is prosecuted within the period of limitations provided by section 13. In this connection, it must be borne in mind that no one is obliged to register a security under this act unless he desires to make use of the mails or of the channels of interstate or "foreign commerce

in the distribution of the security. But if a person does avail himself of the privilege of registration accorded by this act, it is obviously within the Constitutional power of Congress to accord a remedy to *all purchasers who may reasonably be affected by any statements in the registration statement.* The separability Clause in section 25 of the Bill makes certain that Congressional power in this instance has been vested as far and to whatever circumstances the Constitution allows."

It might have been argued that the phrase "all purchasers who may reasonably be affected" was explanatory of Congress' statutory phrase "any person acquiring such securities." In 1933, however, Congress was not deemed to have the broad powers subsequently construed as implicit in the commerce clause. The above paragraph, as a whole, indicates that in referring to persons "reasonably affected," "use of the mails," and the "channels of interstate or foreign commerce," Congress was concerned with justifying a civil remedy even where the shares were purchased in an "intrastate" transaction.

the restrictions Congress placed on Section 11 actions. The court stated that:

"A suit under § 11 of the 1933 Act requires no proof of fraud or deceit, and *such a suit may be maintained only by one who comes within a narrow class of persons i. e., those who purchase securities that are the direct subject of the prospectus and registration statement* (here the purchasers of preferred stock). But proof of fraud is required in suits under § 10b of the 1934 Act * * *. Congress reasonably, and without inconsistency, allowed suits of that sort which (1) are free of the restrictions applicable to a suit under § 11 of the 1933 Act and (2) which are not confined to those persons who may properly sue under that section but which include all who are the victims of the fraud." Id. at 786. (Italics added.)

The court went on to point out that any other construction would provide a haven for those who intend to defraud investors by issuing a prospectus (limited to a small number of shares) and thereby inducing investors to purchase other stock in the same company at inflated prices. See Id. at 787. The Second Circuit's answer was not, however, to construe Section 11 as applying to the other shares (as plaintiff urges this court to do) but rather to imply a new remedy under Section 10b for the defrauded shareholders. Ibid. It is quite true, as plaintiff urges, that the Second Circuit was not actually required to decide whether any person who had purchased other shares of the same class as those shares covered by the registration statement could sue under Section 11 since the relevant Section 11 claim had been abandoned in the district court and the issue was, therefore, not presented on appeal. (It is also true that in Raytheon there were actually two classes of shares involved rather than one class as in the instant case.) Nevertheless, the analysis that:

"A suit under § 11 of the 1933 Act * * * may be maintained only by one who comes within a narrow class of persons i. e., those who purchase securi-

ties that are the direct subject of the prospectus and registration statement. * * * "

was an integral part of the Second Circuit's reasoning in implying a different remedy for persons who did not come within the "narrow class of persons." In Rudnick v. Franchard Corp., 237 F.Supp. 871 (S.D.N.Y.1965) the issue before the court was the permissible class of defendants in a Section 11 action (rather than the permissible class of plaintiffs). The district court's analysis and language in *Rudnick*, however, supports defendants' contention here. See Id. at 873. Finally, Barnes v. Osofsky, 254 F.Supp. 721 (S.D.N.Y.1966) approved a settlement of a Section 11 action precluding participation by shareholders whose shares were not part of the specific public offering in issue. Both *Barnes* and *Rudnick*, however, relied exclusively on the *Raytheon* decision. The case law, therefore, while favoring defendants' construction of Section 11 has not finally laid the issue to rest.

Professor Loss and Milton H. Cohen, formerly Director of the Securities and Exchange Commission's Special Study of Securities Markets, have apparently reached similar conclusions regarding the present state of the securities law:

"Presumably, however, the open-market buyer [plaintiff] must be able to trace his particular securities to the registration statement when it covered additional securities of an outstanding class. * * * " III Loss, Securities Regulation 1731 n. 160 (2d ed. 1961). See Id. at 1689.

"[I]n contrast to the 1933 Act's theory of registering only the actual quantity of securities proposed to be offered, the 1934 Act contemplates registration of an entire 'class' of securities." Cohen, 'Truth in Securities' Revisited, 79 Harv.L.Rev. 1340, 1341 (1966).

In spite of the language of the statute, the legislative history, the case law and the commentators' views, all of which favor defendants' analysis, plaintiff urges that the underlying economic realities

strongly favor its theory that "such shares" refers to all of the outstanding shares of the same class rather than only to the particular shares being registered. Plaintiff urges that when common stock is purchased on the open market the buyer does not know in advance which particular shares he will receive, since all shares of the same class (*i. e.*, all common shares) of a corporation are fungible. Mere blind chance, plaintiff urges, should not determine whether the statutory remedies provided by Section 11 are available to an investor. Moreover, the prospectus (which forms the most important part of the registration statement) is widely distributed and affects the price of all of the outstanding shares of the common stock of the company, not just the new shares issued under the registration statement. (Indeed this problem was one of the reasons that led the Second Circuit to imply a remedy under Section 10b of the 1934 Act. See Fischman v. Raytheon, supra 188 F.2d at 787.) The issuer pursuant to statutory exemption may, and in the instant case did, engage in market "stabilization" during the distribution of the shares issued under the registration statement thereby directly influencing (at least for a limited period of time) the price of all of the outstanding common shares of the company. These arguments have the sound ring of economic reality but unfortunately they merely point up the problems involved in the present scheme of statutory regulation. The Cohen article, supra, argues the case for reform and urges sweeping changes in the securities laws. His proposal, in effect, is to abolish the 1933 Act altogether, expand the scope of the 1934 Act to cover new issues, and obtain broader publication of 1934 Act information by the use of modern means of duplication and distribution. The proposal also calls for raising the quality of disclosures under the 1934 Act to a level similar to that which has obtained under the 1933 Act. See Cohen, supra at 1368–69. He also calls for incorporation of a modified form of 1933 Act liability (i. e., requiring proof of *either* reliance or a demonstrable effect on the price of shares purchased) under the expanded 1934 Act. See Id. at 1369–70. To the extent that his proposal relies more on administrative examination of information filed, see Id. at 1371–72, the proposals are not only contrary to the recent trend of judicial decisions, see Painter, Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5, 65 Colum.L.Rev. 1361 (1965), but may also involve extrinsic considerations. See Parkinson, Parkinson's Law (1957).[5]

A determination that plaintiff does not come within the scope of Section 11 does not mean it is necessarily without a remedy. The complaint also seeks relief for alleged violation, *inter alia,* of Sections 12 and 17 of the 1933 Act, Sections 9, 10(b), 15, and 18 of the 1934 Act, and of common law. Plaintiff, however, urges that these remedies are less satisfactory in that they require proof of reliance and perhaps fraud. To preclude a claim under Section 11, plaintiff contends, will deprive it of the effective remedy that Congress intended it should have.

The reliance problem apparently exists even under Section 11 as to some of plaintiff's purchases. Plaintiff's affidavits and Rule 9(g) statement taken together concede that some of its shares were acquired after March 15, 1962, when Brunswick issued a report containing earning statements covering a period of at least twelve months beginning after the effective date of the Brunswick registration statement, and that this annual report was made generally available to Brunswick's securities holders. Similarly plaintiff concedes that on May 10, 1962, Brunswick issued a "Report to Shareholders" for the first quarter of 1962. Section 11(a) of the Securities Act provides:

> "If such person acquired the security after the issuer has made generally

---

5. The Commission's approval of the registration statement (which is the subject of the instant suit) illustrates one of the problems of excessive reliance on administrative examination.

available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security *relying* upon such untrue statement in the registration statement or *relying* upon the registration statement and *not knowing of such omission * * *.*" 15 U.S.C. § 77k(a) (1964). (Italics added.)

Indeed plaintiff has apparently attempted to meet this restriction in Section 11 by alleging, in Paragraph 17 of the first count of his complaint, the required reliance.[6]

To be sure there is language in *Fischman* suggesting the need for proof of fraud not only in an action under Section 10b of the 1934 Act but also under Section 17 of the 1933 Act. But terms such as "fraud" and "deceit" appearing in the Investment Advisor's Act of 1940 have been construed by the Supreme Court in accordance with the legislative purpose which was "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* * * *.*" S. E. C. v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). The Court made it quite clear in reversing an *en banc* decision of this Circuit that the underlying legislative purpose was equally applicable to the 1933 and 1934 Securities Acts, see Id. at 186–187, 197–198, 200–201, 84 S.Ct. 275, and that the term "fraud" should not be construed in the early common law technical sense. Rather the tendency of later cases both under common law and under the 1933 Act, the Court approvingly noted, was to merge "the proscription against nondisclosure into the general proscription against fraud, treating the former, in effect, as one variety of the latter." Id. at 198, 84 S.Ct. at 286.

Thus the "suppression of information material to an evaluation of the disinterestedness of investment advice 'operated as a deceit on purchasers' [citation omitted] * * *. Later cases also treated nondisclosure as one variety of fraud or deceit." Ibid. See Id. at 200–201, 84 S.Ct. at 287. Moreover, the term "fraud" even if it were to be given a more restrictive construction need not be an insuperable barrier. The exhibits introduced on this motion seem to lend some support to the plaintiff's allegation of nondisclosure or suppression of information material to an evaluation. Thus, in a report issued by defendant Carl M. Loeb, Rhoades and Company, dated October 1960 (about three months before the complained of registration statement became effective) Loeb informed its subscribers that:

> *"Much of the financing of the pinsetter business has been quite expensive for Brunswick.* Under an agreement with the C.I.T. Financial Corporation, initiated in May 1957, Brunswick is *required* to *assign* C.I.T. 80% of its pinsetter installment obligations *and borrow* at least 70% of the paper assigned up to a specified limit, currently $125 million. The interest cost is 6½% *above* the prime rate, i. e. 11%— 11½% during 1960. Brunswick has been charging its customers 6% simple interest on the outstanding balance of notes payable. Thus, Brunswick has an out-of-pocket cost ranging up to 5½% of the dollar value of receivables assigned to C.I.T." Plaintiff's Exhibit C at 6–7. (Italics added.)

The prospectus contains no reference to financing that has been "quite expensive" or to interest charges 6½ percent "above the prime rate." The statement concludes that subsequent to May 1962 (when the C.I.T. agreement expires) Brunswick's finance subsidiary would handle the financing of new installations resulting in

---

6. Paragraph 17 reads as follows:
    "17. Plaintiff acquired the shares of Common Stock referred to in paragraph 16 of this Complaint relying upon the untrue statements in the Registration Statement and the Prospectus and relying upon the Registration Statement and Prospectus without knowing of the omissions therein."

an annual saving of approximately $4,-000,000.

"It would seem reasonable to expect a 1% differential between interest rates charged to customers and Brunswick Credit's cost, creating a $4.5 million gross profit on this [the anticipated portfolio] before administrative expenses." Ibid. To a similar effect see Id. at 19.

The financing arrangements at the time the registration statement became effective, however, resulted in an "out of pocket cost up to 5½%" of the dollar value of receivables rather than a profit of 1%. This information does not appear in the prospectus or registration statement.

The C.I.T. financing arrangement which began in 1957 continued through 1962. Although it was Brunswick's chief source of debit capital the consolidated balance sheet of the registration statement and prospectus listed the C.I.T. arrangement as a current liability, not as a long term debt. S.E.C. regulations require a statement of the interest charges of all long term debts. In November 1960, approximately two months before the registration statement became effective, defendant Lehman Brothers issued a detailed analysis of Brunswick's financial position and prospects, (allegedly to the Metropolitan Life Insurance Company) in order to obtain long term financing in the amount of $150,000,000 for Brunswick. The purpose of the proposed transaction was candidly stated:

"The Company [Brunswick] desires to arrange a long-term credit in an amount up to $150 million, the proceeds of which credit would be used:

1. To replace the present financing agreement with C.I.T. Corporation which currently permits borrowing up to $140 million, secured by pinsetter receivables. This agreement, *which requires the Company to borrow funds at very high interest rates,* expires on May 2, 1962." Plaintiff's Exhibit "H" at I–1. (Italics added.)

The details of the C.I.T. financing agreement requiring Brunswick to assign not less than 80 percent of the unpaid cash balance on all financing paper and which *required* Brunswick to borrow not less than 70 percent of the unpaid principal amount of the assigned paper at the "very high interest rates" were set forth in the Lehman report. See Id. at I–1 through I–4; I–8. A member of the public purchasing the subordinated convertible debentures would have looked in vain in the prospectus for the details of the C.I.T. financing arrangements or for any reference to "very high interest rates" or even any indication of what those interest rates were. Moreover, the propriety of listing the C.I.T. financing under the heading of current liabilities in the prospectus balance sheet is, at the very least, open to serious question. See Lehman Report, Table I–1 at I–7 (classifying the C.I.T. loan as part of "Senior Debt"); Id. at I–4 (C.I.T. loan to be replaced by "orthodox long-term financing").[7] The Lehman report contains tables which reflect some of the impact of this C.I.T. agreement on Brunswick's financial

7. Brunswick itself apparently had some qualms about placing the C.I.T. loans in the current liabilities category. Page 6 of the Brunswick prospectus (plaintiff's Exhibit "A") lists the C.I.T. Corporation loans in a separate category from both short term bank loans and long term debt. Note (2) to the prospectus, also appearing on page 6, refers the reader to notes 3 and 6 of the consolidated financial statement for further details regarding the C.I.T. loans. Note 3 of the consolidated financial statement allots only one three-line paragraph to the C.I.T. loans, stating the amounts assigned as of December 31, 1959, and September 30, 1960, respectively. Note 3 in turn refers to note 6 of the consolidated financial statement. Note 6 indicates that the financing agreement with C.I.T. was "a five year financing agreement." Note 6 does not contain any indication whatever of the interest on the C.I.T. loans nor any indication of the other terms of the C.I.T. loan revealed in both the Lehman and Loeb reports. The only cross reference found in note 6 is to note 7 of the consolidated financial statement. Note 7, dealing with long-term notes, shows interest rates between 4 and 5¾ percent.

structure. See Tables I–2; I–3. The tables contain proforma computations based on the assumption that the interest being paid by Brunswick to C.I.T. would be "cut in half." Id. at I–9. The description following Table I–3 in the Lehman report states:

"In the above table it is interesting to note that since 1958 finance income has been running about even with actual interest expense. On the proforma basis, finance income would have exceeded income expenses by over 50%. This is very significant because it indicates that finance revenues alone (which in 1959 and in the 9 month period in 1960 contributed roughly 16½% of pretax profit before interest) would support proforma interest expenses." Id. at I–9.

This information was indeed "very significant" from the point of view of a prospective long term lender. It may also have been "very significant" from the point of view of the investing public called upon to purchase convertible subordinated debentures (subordinated to all "senior indebtedness") from a company paying the "very high interest rates" rather than the "proforma" rates.

Lehman Brothers was one of two firms designated as representatives of the convertible debenture underwriters and two of Lehman's partners sat on Brunswick's board of directors. Although Section 11 would be the simplest to satisfy it hardly follows that plaintiff will be denied an effective remedy by being precluded from proceeding on Count One, only, of its complaint.

▮ Plaintiff's legal theory, that the registration of any new issue registers (for Section 11 purposes) not merely the new issue but all of the outstanding shares of the same class, has an Alice in Wonderland quality. It is simply untenable on the basis of the statute, the legislative history and the case law. The effect of plaintiff's interpretation would be radically to expand the number of potential plaintiffs as well as the total economic liability of the members of the securities industry under Section 11. The purpose of the stock market, in a mature economy, is the efficient allocation of investment capital. See Robbins, The Securities Markets, 31–58 (1966). Professor Robbins has cautioned, in a discussion of the recent expansion of liability under Rule 10b–5, that "the courts and the SEC should consider more carefully the economic repercussions of their actions." Id. at 101. See Id. at 96–101. 'Truth in Securities' Revisited, supra, delineates the intricate interrelationship of the various sections of the 1933 and 1934 Acts. If far-reaching change is to come, and hopefully it shall, it should be by comprehensive legislation rather than by *ad hoc* judicial reform.

Defendants' motion for summary judgment as to Count One, only, granted.

So ordered.