Arthur BARNES, Plaintiff-Appellee,

v.

Meyer OSOFSKY et al., Defendants-Appellees.

Alfred N. GREENBERG et al., Plaintiffs-Appellees,

v.

AILEEN, INC., et al., Defendants-Appellees.

Reginald SMITH et al., Plaintiffs-Appellees,

v.

AILEEN, INC., et al., Defendants-Appellees.

Nos. 306–308, Dockets 30867–30869.

United States Court of Appeals
Second Circuit.

Argued Jan. 5, 1967.

Decided Feb. 1, 1967.

Milton S. Zeiberg, New York City, for objectants-appellants Fred Zilker and Attilio Occhi.

A. Edward Grashof, New York City (Winthrop, Stimson, Putnam & Roberts, William C. Chanler, New York City, of counsel), for defendants-appellees other than Goodbody & Co.

Frank Weinstein, Weinstein & Levinson, and Richard B. Dannenberg, Lipper, Shinn, Keeley & Dannenberg, New York

City (Aaron Lipper, Irving Steinman, Samuel Weinstein, New York City, of counsel), for plaintiffs-appellees.

Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Richard H. Phillips, Asst. Gen. Counsel, Roy Nerenberg, Washington, D. C., for Securities and Exchange Commission, amicus curiae.

Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge.

Aileen, Inc. is engaged in the design, manufacture and sale of popular priced sports wear for girls and women. Prior to the fall of 1963 it had outstanding 1,019,574 common shares; 205,966 of these, most of them covered by a 1961 registration statement, were traded on the American Stock Exchange, and the balance, 813,608, were owned, in approximately equal proportions, by two officers and directors, Osofsky and Oberlin. Pursuant to a registration statement effective September 10, 1963, a group of underwriters offered at $23.375 per share, substantially the then market price, another 200,000 shares, also to be listed on the American Exchange; 100,000 of these were an original issue, 50,000 were Osofsky's and 50,000 were Oberlin's. The prospectus reported that "Sales volume has grown from $2,120,394 in 1956 to $15,045,826 in 1962 and reached $9,826,655 for the first six months of 1963."

A press release on October 7, 1963, and a supplement to the prospectus on the following day, announced a rift in the lute. Third quarter sales had been little more than in 1962 and the volume of orders for an important spring line had not come up to expectations. The price of the stock, which had been gradually declining since late September, declined some more, reaching $15.75 by the end of October, $14.25 at the year-end, and still lower figures thereafter.

Three class actions by purchasers against the corporation, Osofsky, Oberlin, the principal underwriters and, in one instance, other officers and directors, were brought in the District Court for the Southern District of New York on November 13 and 19, 1963 and August 17, 1964, and were subsequently consolidated. The complaints in all three set forth a claim under § 11 of the Securities Act of 1933 that the registration statement and prospectus contained material misstatements and omissions, primarily in failing to disclose danger signals of which the management was aware prior to the date when the registration statement took effect. One complaint also contained a claim based on § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 and common law fraud, but this was later withdrawn. After discovery and negotiations, a settlement was agreed upon, which the District Court approved after notice and hearing, 254 F.Supp. 721 (S.D.N.Y.1966). This provided for the deposit of a fund of $775,000, 50% of which was contributed by the corporation and the remainder by the two selling stockholders in equal amounts. After payment of approved allowances, the fund was to be distributed among persons "who beneficially acquired (in his own name or otherwise) any part of the 200,000 shares * * * which was the subject of the public offering of September 10, 1963 between September 10, 1963 and August 17, 1964" and who made timely application for participation therein. Seventy-five percent of the fund, called Fund A, was to reimburse such persons for losses suffered prior to November 13, 1963; twenty-five percent, Fund B, was to reimburse them for losses thereafter. The measure of damages for Fund A was the difference between actual cost, not exceeding $23.375 per share, and the sales price for those who had sold the stock or $16.25 per share, the closing market price on November 13, for those who continued to hold it. The measure of damages for Fund B was the difference between actual cost, not exceeding $16.25 per share, and the actual sales price or $8.875 (the closing market price on August 17, 1964), whichever was higher.

The judgment contained a clause barring all actions by purchasers of the 200,000 shares "founded or in any way based upon the subject matter of the pleadings of the above actions, or any of them, including any claim or claims alleged or asserted or which could have been alleged or asserted in said pleadings by virtue of the facts alleged therein."

■ The sole objectors to the settlement were the appellants Attilio Occhi who bought 100 shares on November 22, 1963 at about $15 per share, and Fred Zilker who bought 25 shares on September 12, 1963 for $23.375 and 50 shares on December 23 for $13.50 per share. Their objection went to the provision limiting the benefits of the settlement to persons who could establish that they purchased securities issued under the 1963 registration statement, which thus eliminated those who purchased after the issuance of the allegedly incomplete prospectus but could not so trace their purchases. Although the issue has not yet been passed upon by the special master whom Judge Ryan appointed, it appears likely that Occhi will be able to trace 50 shares which were bought on the open market and Zilker can trace 25 which were bought from an underwriter, but not the balance—all purchased on the market.

■ We need say little as to appellants' argument that even if § 11 of the Securities Act permits recovery only by purchasers of the issue covered by the defective registration statement as the district judge held, the court on a basis of equity should have provided for participation by others who, as a practical matter, may have suffered equally. Whether or not it would have been an abuse of discretion to have diluted a settlement so as to allow recovery by persons not legally entitled thereto, as we incline to think it would have been, surely there would be none in limiting participation to those who might have recovered had the suits been fought and won. The question thus is whether the district court was right in ruling that § 11 extends only to purchases of the newly registered shares.

Section 11(a) provides that:

"In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue"

five categories of persons therein named. The key phrase is "any person acquiring such security"; the difficulty, presented when as here the registration is of shares in addition to those already being traded, is that "such" has no referent. Although the narrower reading—"acquiring a security issued pursuant to the registration statement"—would be the more natural, a broader one—"acquiring a security of the same nature as that issued pursuant to the registration statement"—would not be such a violent departure from the words that a court could not properly adopt it if there were good reason for doing so. Appellants claim there is. Starting from the seemingly correct premise that an unduly optimistic prospectus will affect the price of shares already issued to almost the same extent as those of the same class about to be issued, they say it would therefore be unreasonable to distinguish newly registered shares from those previously traded. In addition, they contend that once it is agreed that § 11 is not limited to the original purchasers, to read that section as applying only to purchasers who can trace the lineage of their shares to the new offering makes the result turn on mere accident since most trading is done through brokers who neither know nor care whether they are getting newly reg-

istered or old shares.[1] Finally, appellants argue that it is often impossible to determine whether previously traded shares are old or new, and that tracing is further complicated when stock is held in margin accounts in street names since many brokerage houses do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position. Therefore, they urge that the narrower construction offends the cardinal principle of equal treatment for persons whose entitlement is not significantly different and a "golden rule" of statutory interpretation "that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." 2 Sutherland, Statutory Construction § 4508.1, p. 118 (Supp. 1966).

Appellants' broader reading would be inconsistent with the over-all statutory scheme. The Securities Act of 1933 had two major purposes, "[t]o provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, * * *" 48 Stat. 74 (1933). These aims were "to be achieved by a general antifraud provision and by a registration provision." 1 Loss, Securities Regulation 178–79 (1961). Section 11 deals with civil liability for untrue or misleading statements or omissions in the registration statement; its stringent penalties are to insure full and accurate disclosure through registration. Since, under §§ 2(1) and 6, only individual shares are registered, it seems unlikely that the section developed to insure proper disclosure in the registration statement was meant to provide a remedy for other than the particular shares registered. In contrast both §§ 12(2) and 17, the antifraud sections of the 1933 Act, where some form of the traditional scienter requirement, dispensed with as to the issuer under § 11, is preserved, are not limited to the newly registered securities. Beyond this, the over-all limitation of § 11(g) that "In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public," and the provision of § 11(e) whereby, with qualifications not here material, an underwriter's liability shall not exceed "the total price at which the securities underwritten by him and distributed to the public were offered to the public," point in the direction of limiting § 11 to purchasers of the registered shares, since otherwise their recovery would be greatly diluted when the new issue was small in relation to the trading in previously outstanding shares.

Appellants' contention also seems to run somewhat contrary to the legislative history. Both the House and Senate versions of the present § 11, in identical language, established a conclusive presumption of reliance upon the registration statement by "every person acquiring any securities specified in such statements and offered to the public." Section 9, S. 875; Section 9, H.R. 4314, 73d Cong., 1st Sess. (1933). Both bills then continued, "In case any such statement shall be false in any material respect, any persons acquiring any securities to which such statement relates, either from the original issuer or any other person" shall have a cause of action against certain specified persons. The bills differed as to the class of people liable and their defenses. As part of a report in which § 11 in its present form was endorsed, the Managers on the part of the House noted that the only changes in § 11 were as to who was liable and

---

1. Appellants note that the impracticability of determining at the moment of purchase whether old or new shares are being acquired has led dealers to comply with the requirements of § 5(b) (2) as to the delivery of a prospectus by doing this on all sales within the period established by § 4(3), see 1 Loss, Securities Regulation 259–60 (1961). While this may enable a purchaser of shares other than those registered to rely on § 12(2) upon an appropriate showing, it does not lead to the conclusion that § 11 applies.

their defenses. H.R.Rep. No. 152, p. 26, 73d Cong., 1st Sess. (1933).

As against this appellants seek to draw some solace from a statement in H.R.Rep. No. 85 that the remedies of § 11 were accorded to purchasers "regardless of whether they bought their securities at the time of the original offer or at some later date" and that this was within the power of Congress "to accord a remedy to all purchasers who may reasonably be affected by any statements in the registration statement." But this can be read to relate only to the extension of liability to open-market purchasers of the registered shares and the same report, in speaking of §§ 11 and 12, said that "Fundamentally, these sections entitle *the buyer of securities sold upon a registration statement* including an untrue statement or omission of a material fact to sue for recovery of his purchase price, or for damages * * *." [Emphasis added.] H.R.Rep. No. 85, p. 9.

While, we have thought it desirable to examine the issue tendered by appellants on its merits, it is not really a new one. In Fischman v. Raytheon Mfg. Co., 9 F.R.D. 707 (S.D.N.Y.1949), rev'd on other grounds, 188 F.2d 783 (2 Cir. 1951), the district court held that common stockholders could not avail themselves of a violation of § 11 in the registration of an issue of convertible preferred in the absence of an allegation that their stock resulted from conversion of the registered issue. Although this ruling was not contested on appeal, we in effect approved it, saying that an action under § 11 may be maintained "only by one who comes within a narrow class of persons, i. e. those who purchase securities that are the direct subject of the prospectus and registration statement." 188

F.2d at 786. While appellants characterize this statement as dictum, both because the point was not contested and because this court did not have to face up to the question of the rights of a purchaser of other shares of the same nature as those registered, the statement carries particular weight because of its authorship by Judge Frank, a leading member of the SEC in its early days, and it afforded a basis for the court's conclusion that allowing an action under § 10(b) of the 1934 Act would not simply duplicate a remedy already given by § 11 of the 1933 Act. Recently, in Colonial Realty Corp. v. Brunswick Corp., 257 F.Supp. 875 (S.D.N.Y.1966), Judge Edelstein reviewed the problem and concluded in favor of the traditional limited reading of § 11 on the merits as well as under the authority of *Fischman.* The leading treatise is in accord, 3 Loss, Securities Regulation 1731 fn. 160 (1961 ed.), as is the Securities and Exchange Commission in a brief as *amicus curiae* filed in response to our invitation.

Without depreciating the force of appellants' criticisms that this construction gives § 11 a rather accidental impact as between one open-market purchaser of a stock already being traded and another, we are unpersuaded that, by departing from the more natural meaning of the words, a court could come up with anything better. What appellants' argument does suggest is that the time may have come for Congress to reexamine these two remarkable pioneering statutes in the light of thirty years' experience, with a view to simplifying and coordinating their different and often overlapping remedies. See the provocative article by Milton H. Cohen, Truth in Securities Revisited, 79 Harv.L.Rev. 1340 (1966).[2]

Affirmed.

---

2. While appellants contend that we should put the burden of tracing on the defendants, they have not sufficiently demonstrated the unreasonableness of leaving that burden on them, which is the more normal rule.