George R. GUENTHER, James L. Krum, Darwin J. Monson, Kenneth J. Perrington, Edward W. Reed, Fred H. Roberts, Richard Volkmann, George Fox, Douglas A. Florine, and John H. Richter, on behalf of themselves and all others similarly situated and derivatively on behalf of Cooper Life Sciences, Inc., Plaintiffs,

v.

COOPER LIFE SCIENCES, INC.; The Cooper Companies, Inc.; Cooper Development Company; Parker G. Montgomery; A. Kenneth Nilsson; Charles Crocker; Robert W. Jamplis; Barbara Hunter Foster, as Executrix of the Estate of Hugh K. Foster; Michael Mitzmacher; Joseph A. Dornig; Martin M. Koffel; Richard W. Turner; John M. Vuko; Randolph B. Stockwell; Hambrecht & Quist, Inc.; Peat, Marwick Main & Co.; Gryphon Associates, L.P.; and The Gryphon Management Group, Ltd., Defendants.

No. C–89–1823 MHP.

United States District Court, N.D. California.

Dec. 12, 1990.

Vance K. Opperman, Richard A. Lockridge, W. Joseph Bruckner, Opperman & Paquin, Vernon J. Vander Weide, Head, Hempel, Seifert & Vander Weide, Minneapolis, Minn., Jack Corinblit, Marc M. Seltzer, Corinblit, Shapero & Seltzer, Los Angeles, Cal., for plaintiffs.

Denise M. Amantea, Jared L. Kopel, Valerie D. Lewis, Elizabeth Roth, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., for Cooper Development Co., Gryphon Associates, L.P., Gryphon Management Group, Ltd., Cooper Life Sciences, Inc., Parker G. Montgomery, A. Kenneth Nilsson, Charles Crocker, Robert W. Jamplis, Barbara Hunter Foster, Michael Mitzmacher, Joseph A. Dornig, Martin M. Koffel, Richard W. Turner, John M. Vuko, Randolph B. Stockwell.

Melvin R. Goldman, Darryl P. Rains, Jordan Eth, Morrison & Foerster, San Francisco, Cal., for Hambrecht & Quist, Inc.

Boake Christensen, Richard North Patterson, Charlene S. Shimada, Charmaine F. Mesina, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Peat Marwick Main & Co.

Walter C. Robinson, III, Emmett C. Stanton, Ellyn Freed, Pillsbury, Madison & Sutro, San Francisco, Cal., for Cooper Companies, Inc.

Marvin D. Morgenstein, Lee Ann Huntington, Morgenstein & Jubelirer, San Francisco, Cal., for Martin M. Koffel, Richard W. Turner, John M. Vuko.

## OPINION

PATEL, District Judge.

Plaintiff investors brought this putative class action alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, including a claim under section 11 of the Securities Exchange Act of 1933, 15 U.S.C. § 77k, and pendent state claims, including a negligence claim against defendant KPMG Peat Marwick ("Peat Marwick"). The parties are now before the court on defendant Peat Marwick's motion for partial summary judgment against plaintiffs' section 11 and negligence claims. Having considered the papers and arguments of the parties, and for the following reasons, the court GRANTS defendant's motion for summary judgment as to plaintiffs' section 11 claims, GRANTS defendant's motion as to the negligence claim of plaintiffs Kenneth J. Perrington and George Fox, and DENIES defendant's motion as to all other plaintiffs' negligence claim.

## BACKGROUND

Plaintiffs purport to represent a class of investors who purchased stock in Cooper LaserSonics, Inc. ("CLS"), between June 17, 1985 and January 28, 1988, Revised Second Amended and Supplemental Complaint ("Complaint") at ¶ 24, during which period there were two public offerings of CLS stock. Plaintiffs allege that misleading reports audited by defendant Peat Marwick were included in a February 19, 1986 amendment to a June 14, 1985 registration statement filed in connection with the first public offering, and in a February 27, 1987

registration statement filed in connection with the second public offering.

Plaintiffs purchased their stock in Minnesota and brought this class action in the district of Minnesota. Defendants moved for a transfer of venue pursuant to 28 U.S.C. § 1404(a), which the Minnesota district court granted. Peat Marwick has moved for partial summary judgment against plaintiffs on their section 11 and negligence claims.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

## DISCUSSION

Defendant Peat Marwick has moved for partial summary judgment on both plaintiffs' section 11 claim and their negligence claim. Regarding plaintiffs' section 11 claim, defendant argues that plaintiffs lack section 11 standing. On plaintiffs' negligence claim, defendant contends that it owed plaintiffs no duty. Alternatively, defendant argues for summary judgment on the negligence claim of plaintiffs Perrington and Fox because they cannot show actual reliance.

### I. *Section 11 Standing*

A cause of action under section 11 is available only to purchasers of "stock actually issued in the offering for which the plaintiff claims there was a false or otherwise misleading registration statement." *Abbey v. Computer Memories, Inc.*, 634 F.Supp. 870, 872 (N.D.Cal.1986). Thus, to have standing under section 11, plaintiffs must establish that they purchased shares either (1) directly in the public offering for which the misleading registration statement was filed or (2) traceable to that public offering.[1] See *Kirkwood v. Taylor*, 590 F.Supp. 1375, 1378 (D.Minn. 1984), *aff'd*, 760 F.2d 272 (8th Cir.1985); *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967). The burden of tracing shares to a particular public offering rests with plaintiffs. *Abbey*, 634 F.Supp. at 876 n. 5.

Plaintiffs purport to represent a class of investors who purchased CLS shares on the open market at any time from June 17, 1985 through January 28, 1988. Complaint at ¶ 24. CLS filed its first registration statement on June 14, 1985; it amended that statement on February 19, 1986. The amended statement contained the first published allegedly mislead-

---

1. The results of this standing requirement are admittedly arbitrary in certain respects. For example, if stock has been issued at two separate offerings and the registration statement for the second offering is misleading, shareholders purchasing stock on the open market after the filing of the second registration statement are much more likely to have been influenced by the more recent of the two registration statements. Nevertheless, under the tracing requirement articulated in *Osofsky*, shareholders who

rely on the misleading statement and purchase stock on the open market can bring a section 11 suit only if the particular shares they purchased happen to be traceable to the second rather than the first public offering. While acknowledging the "rather accidental impact" of its construction of section 11, the *Osofsky* court maintained that its reading was true to the actual language of section 11 and consistent "with the overall statutory scheme." *Osofsky*, 373 F.2d at 272–73.

ing report audited by Peat marwick. Defendants filed another registration statement in connection with a second public offering on February 27, 1987. Plaintiffs allege that this report is also misleading.

Some plaintiffs purchased stock between the filing of the initial registration statement and the allegedly misleading February 1986 amendment. Because the stock purchased by these plaintiffs was not issued pursuant to a defective registration statement, argue defendants, these plaintiffs lack standing. Furthermore, the remaining plaintiffs have not traced their stocks to the February amendment or the second offering, and thus may own shares originally issued in connection with the first registration statement. Because these plaintiffs have not traced their securities to a defective registration statement, defendants argue that they also lack standing under section 11.

The question of how to treat an allegedly misleading post-effective amendment in the context of tracing appears to be one of first impression. It is, however, a question addressed squarely by the same regulation requiring the filing of post-effective amendments:

> for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

17 C.F.R. § 229.512(a)(2) (1990).

Under section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, actions under section 11 and section 12(1) must in all instances be brought within three years after the security was first offered. Without section 229.512(a)(2), it is possible that the statute of limitations could run on a section 11 claim in a continuous offering before investors who purchase in a delayed offering even purchase their securities. Section 229.512(a)(2) avoids this anomalous result and "insure[s] that liability protection under the Securities Act remain[s] in force throughout the life of the shelf registration statement," Delayed or Continuous Offering and Sale of Securities, 46 Fed.Reg. 42001, 42003 (1981), by treating post-effective amendments offering securities as the "initial bona fide offering thereof." For securities offered in a post-effective amendment, then, the three-year statute of limitations clock begins running on the date of the amendment rather than the date of the initial offering and registration statement.

In their papers, plaintiffs argue that because no new securities were offered in the February 1986 amendment, the "securities offered therein" must be the securities offered in the initial June 1985 offering.[2] Thus, according to plaintiffs, the otherwise non-defective 1985 registration statement is rendered retroactively blemished by the defective 1986 amendment. This reading of the provision would enable investors, such as some of the plaintiffs here, to bring a section 11 action even though at the time they purchased their shares they could not possibly have relied on misleading registration statements, since none had been filed. Such a result would clearly contravene the purpose of section 11. Under section 229.512(a)(2), liability attaches only to securities actually offered in a defective post-effective amendment, not to se-

---

2. At oral argument plaintiffs abandoned this theory and contended that section 229.512(a)(2) pertains simply to the twelve-month period of presumptive reliance. (Under section 11, plaintiffs need not prove or even assert reliance unless the issuer of the security has published to security holders "an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement...." 15 U.S.C. § 77k(a).) Under this reading, the filing of a post-effective amendment simply begins the twelve-month period of presumptive reliance anew. Even this view of section 229.512(a)(2), however, does not result in section 11 standing for plaintiffs. As plaintiffs' counsel essentially conceded at oral argument, under this interpretation plaintiffs who purchased stock issued before February 19, 1986, have no section 11 cause of action because the shares they purchased were not issued pursuant to a defective registration statement. This window of nonliability gives rise, in turn, to a tracing problem for those plaintiffs who purchased shares after February 19, 1986, since they must trace their shares to a defective registration statement.

curities previously offered in a non-defective registration statement.

Accordingly, the court finds that plaintiffs who purchased shares in the first offering have no standing to bring a section 11 action, even if they purchased their shares on the open market after the February amendment, since a cause of action under section 11 is available only to purchasers of "stock actually issued in the offering for which the plaintiff claims there was a false or otherwise misleading registration statement." *Abbey*, 634 F.Supp. at 872. Similarly, plaintiffs who purchased shares on the open market after the second offering, with its allegedly misleading registration statement, cannot bring a section 11 claim unless they can trace their shares to that offering. Because plaintiffs have made no attempt to trace their shares, the court grants defendant's motion for summary judgment on plaintiffs' section 11 claim.

## II. *Peat Marwick's Duty Under State Law*

### A. Choice of Law

■ A preliminary question in determining whether Peat Marwick had a duty to plaintiffs is whether Minnesota or California law applies. Both parties agree that Minnesota's choice of law rules govern this inquiry. Motion for Partial Summary Judgment at 8; Opp. at 11; *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 243 n. 8, 102 S.Ct. 252, 260 n. 8, 70 L.Ed.2d 419 (1981). The parties also agree that under Minnesota law, the court must consider the following five factors in determining which state's law is applicable: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *See Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408, 412 (1973). Not surprisingly, however, the parties disagree about which state's law is favored by Minnesota's five-part test.

The first prong of Minnesota's test, predictability of results, is intended to protect the justified expectations of the parties to the transaction. *SCM Corp. v. Deltak Corp.*, 702 F.Supp. 1428, 1430 (D.Minn. 1988). It applies "primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Hime v. State Farm Fire & Casualty Co.*, 284 N.W.2d 829, 833 (Minn.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). If there was any reasonable expectation in these transactions, it would have been that plaintiffs would be protected by the law of the state in which they purchased the stocks.

Under the second element of Minnesota's choice-of-law analysis, "no more is called for than that the court apply the law of no state which does not have substantial connection with the total facts and the particular issue being litigated." *Milkovich*, 203 N.W.2d at 412. Plaintiffs, citing the findings of the Minnesota transferor court, argue that Minnesota has no such substantial connection in the present case:

> Aside from the sale and purchase of the plaintiffs' shares ... all relevant transactions and communications occurred in northern California.... These facts, as to which it appears no serious contest exists, make clear that the Northern District of California bears a much more intimate connection to the events which may underpin this case than does the District of Minnesota.

*Guenther v. Cooper Life Sciences, Inc.*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,314, at 92,073–74, 1988 WL 131340 (D.Minn. Dec. 5, 1988). The question before the transferor court, however, was not whether Minnesota had a substantial connection to the case, but whether northern California was the more convenient forum for the parties and the witnesses. *Id.* at 92,073; *see* 28 U.S.C. § 1404(a).

While this district may have a "much more intimate connection to the events" giving rise to this litigation than does Minnesota, that fact does not preclude a finding that Minnesota also bears a substantial connection to the case. Given that plaintiffs are Minnesota residents who purchased stock in Minnesota, this court cannot find that Minnesota has no such con-

**1442**

nection to the case. Because both states meet this substantial connection requirement, the second factor in Minnesota's formula favors neither state.

The third prong of the Minnesota test, simplification of the judicial task, is a consideration only where a court would have difficulty "accurately discovering and interpreting the law" it applies. *See SCM Corp.*, 702 F.Supp. at 1431. Since there is no practical difficulty involved in applying the law of either California or Minnesota, this factor does not tip the scales in favor of applying either state's law.

The fourth consideration in Minnesota's analysis is the "advancement of the forum's governmental interests." The focus of the analysis under this prong is "whether the [forum] state has a strong interest, reflected in its public policy, which favors a particular choice of law." *Id.* Determining whether another state's law or Minnesota's law best serves the public policy of Minnesota seems an almost tautological exercise, since Minnesota's own laws presumptively serve any strong public policy interest that state has. Indeed, the only way for a court sitting in California—or in Minnesota, for that matter—to ascertain what constitutes Minnesota's "public policy" or its "governmental interests" is to look to Minnesota statutory and case law. In the area of law relevant to the present case, for example, Minnesota has chosen to follow the Restatement (Second) of Torts approach in determining the scope of an accountant's duty to third parties. *Florenzano v. Olson*, 387 N.W.2d 168, 174 n. 3 (Minn.1986); *see also Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291, 198–99 (1976). California has adopted a more expansive foreseeability standard. *International Mortgage Co. v. John P. Butler*

*Accountancy Corp.*, 177 Cal.App.3d 806, 820, 223 Cal.Rptr. 218 (1986). California and Minnesota have chosen to strike somewhat different balances between the interests of accountants and third parties. It would be an extraordinary example of overreaching for this court to find that California's standard would best serve Minnesota's public policy interests. If Minnesota's legislature or courts believed that a more expansive approach to accountant liability would best serve Minnesota's interests, they would have adopted such an approach. This fourth consideration, then, strongly favors applying Minnesota law in this case.[3]

The fifth consideration of the Minnesota analysis, concern for the "better law," comes into play "only when other choice-influencing considerations leave the choice of law uncertain." *Myers v. Government Employees Ins. Co.*, 302 Minn. 359, 225 N.W.2d 238, 244 (1974). Of the four considerations, the only two that weigh in favor of either state weigh in favor of Minnesota. Thus, the court will apply Minnesota law without considering which state's law is the better law.[4]

### B. Minnesota Law

■ In defining the scope of liability for those who negligently supply information for the guidance of others, the Restatement (Second) of Torts limits liability to loss suffered by "the person or one of a limited group of persons for whose benefit and guidance [the provider of information] intends to supply the information or knows that the recipient intends to supply it...." Restatement (Second) of Torts § 552(2)(a) (1977). The drafters of the Restatement elaborated on this particular provision as follows:

**3.** The court's analysis of the fourth factor in Minnesota's choice-of-law test highlights the dubious value of the *Milkovich* approach to choice-of-law questions. The circular nature of the analysis mandated by *Milkovich*'s fourth factor is particularly troublesome given the fact that the second and third factors rarely point in the direction of either state's law, and the fifth factor comes into play only where the first four factors yield an uncertain outcome. *See Myers v. Government Employees Ins. Co.*, 302 Minn. 359, 225 N.W.2d 238, 244 (1974).

**4.** If the court were to consider the fifth factor—which, for the sake of clarity and literary parallelism, might be better termed "quality of the rule of law"—it would be swayed by the uncertain status of California law, the California Supreme Court having granted review in the most recent California appellate court decision following *Butler*. *Bily v. Arthur Young & Co.*, 222 Cal.App.3d 289, 271 Cal.Rptr. 470, *review granted and opinion superseded,* —— Cal.3d ——, 274 Cal.Rptr. 371, 798 P.2d 1214 (1990). Surely the better law is one that is settled, and California's still in substantial flux.

It is sufficient, ... insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

Restatement (Second) of Torts § 552 comment h (1977).

In determining whether Peat Marwick owed a duty to plaintiffs, then, the question is whether Peat Marwick knew that CLS intended to circulate Peat Marwick's audited report to a limited group of persons for that group's benefit and guidance. There is no question here that Peat Marwick knew CLS intended to include Peat Marwick's audited report in a prospectus that would be circulated for the benefit and guidance of potential investors.[5] Peat Marwick argues, however, that investors are members of a potentially unlimited class and therefore do not fall within the ambit of section 522.

Peat Marwick's contention that potential investors constitute an unlimited class presupposes that the reference to "limited" in section 552 refers to a group's size. The adjective "limited," however, pertains not to size, but to identifiability. While size is certainly one of the criteria that may be used to limit a group's membership, it is but one of many possible restrictive criteria that can define the contours of a "limited group." Thus, it is not necessary that a group be restricted by size in order to qualify as "limited" under section 552. It is enough that providers of information know that their client intends to provide the information for the benefit and guidance of a group of people, and that the information provider understand the parameters that define the third-party group. Where a group is identifiable, accountants and other information providers are not relieved of liability merely because the group of people whom they intend to influence with their information is too large.

Here, Peat Marwick was aware not just of "the ever-present possibility of repetition to anyone," but of CLS's intention to distribute the audited report to a clearly defined group—potential investors. As members of that limited group, plaintiffs were owed a duty by Peat Marwick.[6]

### III. *Actual Reliance*

■ Defendant Peat Marwick's third argument in support of its motion for summary judgment is that plaintiffs did not rely on the allegedly misleading Peat Marwick audited report. Peat Marwick initially claimed that none of the plaintiffs could show reliance; after deposing four of the plaintiffs, however, Peat Marwick has modified its position and now moves for summary judgment against only plaintiffs Perrington and Fox on this ground.

Under section 552(2)(b), plaintiffs must prove actual reliance on the representation in question.[7] *See, e.g., Bonhiver,* 248

---

5. Indeed, Peat Marwick specifically consented to that use of its report.

6. It is perhaps significant that the *Bonhiver* court actually quoted a tentative draft version of section 552 that differed slightly from the final version. The tentative draft did not contain the reference to a "limited group," but instead limited liability to loss suffered by "the person or one of the persons for whose benefit and guidance [the information provider] intends to supply the information, or knows that the recipient intends to supply it...." *Bonhiver,* 248 N.W.2d at 298–99 (quoting Restatement (Second) of Torts § 552(2)(a) (Tent. Draft No. 12). Thus, under the version of section 552 actually quoted by the *Bonhiver* court, it is enough that an information provider knows its client intends to provide the information to third persons for their benefit and guidance. *Cf. TFC Banking and Sav., F.A. v. Arthur Young & Co.,* 706 F.Supp. 1408, 1419 (D.Minn.1988) ("[i]f it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can attach") (quoting *Badische Corp. v. Caylor,* 257 Ga. 131, 356 S.E.2d 198, 200 (1987)).

7. Even under California law, contrary to plaintiffs' contention, reliance is required. *See, e.g., Butler,* 177 Cal.App.3d at 820, 223 Cal.Rptr. 218 ("An innocent plaintiff who foreseeably relies on an independent auditor's unqualified financial statement should not be made to bear the burden of the professional's malpractice.").

N.W.2d at 301–02. The deposition testimony of plaintiffs Perrington and Fox, however, establishes that they did not rely on the audited report in question. There being no genuine issue of fact on this point, the court GRANTS defendant's motion for partial summary judgment as to the negligence claim of plaintiffs Perrington and Fox.

CONCLUSION

Plaintiffs purchased stock issued pursuant to registration statements filed on June 14, 1985, and February 27, 1987. The first allegedly misleading SEC statement was a February 1986 post-effective amendment to the June 14, 1985 registration statement. No section 11 liability attaches to the shares offered in the non-defective June 14, 1985 registration statement. Because plaintiffs have not traced their shares to a defective registration statement, defendant's motion for partial summary judgment as to plaintiffs' section 11 claim is GRANTED.

Minnesota's choice-of-law rules govern this court's decision about which state's law to apply to plaintiffs' negligence claim. Under Minnesota's five-part test, Minnesota law is favored. Under Minnesota law, defendant did owe a duty to plaintiffs because plaintiffs were part of a limited group for whose benefit and guidance defendant knew its report would be provided by its client, CLS. Plaintiffs Perrington and Fox, however, cannot show actual reliance on the reports in question. Defendant's motion for partial summary judgment is therefore GRANTED as to the negligence claim of plaintiffs Perrington and Fox and DENIED as to all other plaintiffs.

IT IS SO ORDERED.