[No. G001099. Fourth Dist., Div. Three. Feb. 20, 1986.]

INTERNATIONAL MORTGAGE COMPANY, Plaintiff and Appellant, v. JOHN P. BUTLER ACCOUNTANCY CORPORATION et al., Defendants and Respondents.

COUNSEL

Manatt, Phelps, Rothenberg & Tunney, Manatt, Phelps, Rothenberg, Tunney & Phillips, Paul J. Hall and John W. Cochrane for Plaintiff and Appellant.

Parkinson, Wolf, Lazar & Leo, Alan H. Lazar, Jeffrey H. Leo and Cathryn M. Brogan for Defendants and Respondents.

## OPINION

**TROTTER, P. J.**—We are asked to declare for the first time that a certified public accountant (CPA) owes a duty of care to reasonably foreseeable plaintiffs who rely on alleged negligently prepared and issued unqualified audited financial statements.

John P. Butler Accountancy Corporation (Butler) entered into an agreement with Westside Mortgage, Inc. (Westside) to audit Westside's financial statements for the year ending December 31, 1978. Butler completed its audit and issued unqualified audited financial statements on March 22, 1979.

Westside is a mortgage company that arranges financing for real property. It accepts loan applications, screens qualified buyers, obtains real estate appraisals, and then either lends the funds requested or finds outside lenders. The loans are then sold to other mortgage bankers.

The December 31, 1978, financial statements, as audited by Butler, listed Westside's corporate net worth as $175,036. The primary asset shown on its balance sheet was a $100,000 note receivable secured by a deed of trust on real property in Riverside. The footnotes to the financial statements indicated the fair market value of the property to be $115,000 as determined by a January 13, 1975 appraisal. In reality, the note was worthless. The trust deed had been wiped out by a prior foreclosure of a superior deed of trust at a trustee's sale in August 1977.

International Mortgage Company (IMC), a subsidiary of Kaufman & Broad, a major real estate developer, approached Westside in October of 1979 for the purpose of buying and selling loans on the secondary market. In order to demonstrate its financial position, Westside provided IMC with copies of the audited financial statements of March 22, 1979.

After reviewing Westside's financial statements, IMC and Westside negotiated a complex master purchase agreement which they signed on December 13, 1979. Under this agreement, Westside and IMC were to buy and sell various government loans, including Federal Housing Administration (FHA) loans.

The erroneous valuation of the $100,000 trust deed was material to an accurate representation of Westside's financial condition, since the note constituted 57 percent of Westside's net worth. Without the note, Westside was capitalized at under $100,000 ($75,035) and, thus, not qualified to do business in FHA insured loans such as those included in Westside's contracts with IMC. Butler was aware at the time of the audit that Westside needed to maintain a net worth of at least $100,000 to qualify for FHA business.

Westside entered into a series of contracts to sell government loans to IMC in April 1980. However, it failed to deliver the promised trust deeds to IMC, causing alleged damage of $475,293. In June of 1980, Westside issued a promissory note to IMC for the $475,293; it paid $40,000 on the note and then defaulted on the balance. After further efforts to obtain payment from Westside and its principal owners failed, IMC brought suit against Westside, its owners, principals, and Butler.[1]

IMC alleged two causes of action against Butler: negligence and negligent misrepresentation, based on Westside's financial statements of December 31, 1978, which Butler had audited and issued without qualification. It allegedly relied on the defective financial statements in deciding to do business with Westside.

It was admitted Butler had no knowledge of IMC at the time of the audit, nor did IMC contact Butler to verify the financial statements' accuracy. Further, Butler was unaware of IMC's receipt of, and reliance upon, Westside's financial statements.

Butler moved for summary judgment, arguing that, as a matter of law, a CPA owes no duty of care to a third party who was not specifically known to the accountant as an intended recipient of the audited financial statement. The trial court granted Butler's motion, finding no duty of care existed. This appeal followed.

We recognize the determination of whether a legal "duty" is owed by one to another in order to give rise to tort liability based on its breach is not a question at all. It is in reality " 'a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts, *supra,* at pp. 332-333.) [¶] The history of the concept of duty in itself discloses that it is not

---

[1]Only IMC's claim against Butler is before us on this appeal.

an old and deep-rooted doctrine but a legal device of the latter half of the nineteenth century designed to curtail the feared propensities of juries toward liberal awards. 'It must not be forgotten that "duty" got into our law for the very purpose of combatting what was then feared to be a dangerous delusion (perhaps especially prevalent among juries imbued with popular notions of fairness untempered by paramount judicial policy), viz., that the law might countenance legal redress for all foreseeable harm.' (Fleming, An Introduction to the Law of Torts (1967) p. 47.)" (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

The application of the "duty" doctrine to the accounting profession has been unique. Beginning with Justice Cardozo's seminal opinion in *Ultramares Corp.* v. *Touche* (1931) 255 N.Y. 170 [174 N.E. 441; 74 A.L.R. 1139], certified public accountants have been shielded from liability for negligence in the preparation and issuance of unqualified audited financial statements when the plaintiff was only a member of a foreseeable class. Liability, based on a "duty" analysis, was limited to those "in privity" with the accountant and more recently to those "intended" recipients of the information. (E.g., Rest.2d Torts (1977) § 552.)

In *Ultramares,* Fred Stern & Co. employed defendants, a firm of CPA's, to conduct an annual audit. Touche negligently overvalued Stern's assets. Plaintiff, who loaned money to Stern in reliance upon the audited balance sheet supplied to it by Stern, successfully sued Touche on the theories of negligence and fraud. On appeal, the court reversed the negligence cause of action. "A different question develops when we ask whether they owed a duty to these to make it without negligence. If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. . . . [¶] Our holding does not emancipate accountants from the consequences of fraud. It does not relieve them if their audit has been so negligent as to justify a finding that they had no genuine belief in its adequacy, for this again is fraud. It does no more than say that, if less than this is proved, if there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made." (*Ultramares Corp.* v. *Touche, supra,* 255 N.Y. at pp. 179, 189.)

Even as he was limiting accountants liability by requiring privity before a duty could be found, Justice Cardozo recognized such a holding, even in 1931, was against the flow of the common law. For he observed "[t]he

assault upon the citadel of privity is proceeding in these days apace. How far the inroads shall extend is now a favorite subject of juridical discussion. [Citations.]" (*Ultramares* v. *Touche, supra,* 255 N.Y. at p. 180.)

Yet, the privity requirement in accountant malpractice suits has survived the shifting sands of time and remains relatively intact today in most jurisdictions. That the "citadel" has not been breached, insofar as concerns certified public accountants' liability, may well be due to the reputation of the distinguished author of *Ultramares.* While we recognize his brilliance and the then compelling logic of *Ultramares,* we assert that, in light of other decisions (discussed, *infra*) and the role of an independent auditor in today's society, the rule of *Ultramares* is no longer consistent with the fundamental principles of California negligence law.

Interestingly, Justice Cardozo had no such protectionist concerns for manufacturers. In *MacPherson* v. *Buick Motor Co.* (1916) 217 N.Y. 382 [111 N.E. 1050], decided years before *Ultramares,* Justice Cardozo noted, "We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law." (*Id.,* at p. 1053.)

Thus, even as *Ultramares* was being articulated, the tide of precedent had already begun to move against the privity rule. The erosion continued, washing away the protection from all other professions, leaving accountancy as some ennobled species specially protected by the "citadel."

Attorneys had traditionally been the beneficiaries of the privity rule as well. In *Nat. Savings Bank* v. *Ward* (1880) 100 U.S. 195 [25 L.Ed. 621], the United States Supreme Court held "[b]eyond all doubt, the general rule is that the obligation of the attorney is to his client and not to a third party . . ." (*Id.,* at p. 200 [25 L.Ed. at p. 623].) California soon followed, adopting the privity rule articulated by the *Nat. Savings Bank* Court. (*Buckley* v. *Gray* (1895) 110 Cal. 339 [42 P. 900].) However, in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], where a notary public negligently failed to obtain proper attestation of a will denying the intended beneficiary her inheritance, the court abandoned the privity rule, overruled *Buckley,* and substituted a balancing test instead. "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection

between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. (Cf. Prosser, Torts (2d ed. 1955), §§ 36, 88, 107, pp. 168, 172, 544-545, 747; 2 Harper and James, Torts (1956), § 18.6, p. 1052.)" (*Biakanja* v. *Irving, supra,* 49 Cal.2d at p. 650.)

In *Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685] the court faced a factual scenario almost identical to that presented in *Buckley* v. *Gray, supra,* 65 years before. The result, however, was quite different. The court stated, "The reasoning underlying the denial of tort liability in the *Buckley* case, i.e., the stringent privity test, was rejected in *Biakanja* v. *Irving,* 49 Cal.2d 647, 648-650 [320 P.2d 16, 65 A.L.R.2d 1358], where we held that a notary public who, although not authorized to practice law, prepared a will but negligently failed to direct proper attestation was liable in tort to an intended beneficiary who was damaged because of the invalidity of the instrument. It was pointed out that since 1895, when *Buckley* was decided, the rule that in the absence of privity there was no liability for negligence committed in the performance of a contract had been greatly liberalized. (49 Cal.2d at p. 649.)" (*Lucas* v. *Hamm, supra,* 56 Cal.2d at p. 588.)

The demise of privity in California was announced in *Heyer* v. *Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161]. There, the court recognized when a lawyer agrees to draft a will for his client he assumes a relationship and duty to the client's beneficiaries independent of his previously recognized attorney-client relationship. "When an attorney undertakes to fulfill the testamentary instructions of his client, he realistically and in fact assumes a relationship not only with the client but also with the client's intended beneficiaries. The attorney's actions and omissions will affect the success of the client's teatamentary [*sic*] scheme; and thus the possibility of thwarting the testator's wishes immediately becomes foreseeable. Equally foreseeable is the possibility of injury to an intended beneficiary. In some ways, the beneficiary's interests loom greater than those of the client. [¶] The duty thus recognized in *Lucas* stems from the attorney's undertaking to perform legal services for the client but reaches out to protect the intended beneficiary. We impose this duty because of the relationship between the attorney and the intended beneficiary; public policy requires that the attorney exercise his position of trust and superior knowledge responsibly so as not to affect adversely persons whose rights and interests are certain and foreseeable." (*Id.,* at pp. 228-229.)

While recognizing the existence of the above cases, Butler argues they are inapposite and *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335 [134

Cal.Rptr. 375, 556 P.2d 737] is applicable here by analogy. Not so. In *Goodman,* the attorney-defendant gave confidential information to his client regarding a pending SEC registration. The client, *without mentioning the attorney's advice,* sold stock to the buyer-plaintiff. The attorney's advice was incorrect, and the buyer-plaintiff suffered damages when the SEC cancelled the registration. The court held that the attorney did *not* owe the third party buyers a duty of care because the advice was not transmitted to them. Although the client relied on the attorney's advice, the buyers did not.

The *Goodman* court also ruled that it would be against public policy to hold an attorney liable to a third party for *confidential* advice which the attorney gives to a client. "To make an attorney liable for negligent confidential advice not only to the client who enters into a transaction in reliance upon the advice but also to the other parties to the transaction with whom the client deals at arm's length would inject undesirable self-protective reservations into the attorney's counseling role." (*Id.,* at p. 344.)

Here, as distinguished from *Goodman,* the plaintiff did receive and did rely upon the alleged misinformation. Further, audited financial statements are not confidential information for the client only, but are instead investigatory reports for possible, if not probable, public use in the business world.

Accepting the obvious trend away from a privity requirement, Butler argues the duty of an accountant should be determined by the "end and aim" analysis. It claims Justice Cardozo in *Ultramares* did not exempt accountants from liability because of the absence of privity, but rather the court applied the "end and aim" test. In support of this position, reference is made to *Glanzer* v. *Shepard* (1922) 233 N.Y. 236 [135 N.E. 275, 23 A.L.R. 1425], also written by Justice Cardozo nine years before *Ultramares.* In *Glanzer* plaintiffs purchased beans, the amount of payment for which was to be determined by weigh sheets certified by defendant public weighers. A discrepancy materialized in the weight of the beans and plaintiffs sued for overpayment. The court stated, "We think the law imposes a duty toward buyer as well as seller in the situation here disclosed. The plaintiffs' use of the certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers' knowledge, was the end and aim of the transaction." (*Glanzer* v. *Shepard, supra,* 233 N.Y. at pp. 238-239.) Though not argued by Butler, the *Glanzer* opinion cites *MacPherson Buick, supra,* stating, "[w]e do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law (cf. *MacPherson* v. *Buick Motor Co.,* 217 N.Y. 382, 390). [¶] There is nothing new here in

principle. If there is novelty, it is in the instance only. One who follows a common calling may come under a duty to another whom he serves, though a third may give the order or make the payment . . . ." *(Id.,* at p. 239.) The *Glanzer* court then cited numerous illustrations of imposition of liability without a privity relationship based on a duty to a third party. It noted "[c]onstantly the bounds of duty are enlarged by knowledge of a prospective use . . . ." *(Id.,* at p. 240.)

As pointed out by Justice Wiener in his thoughtful review of this area (Wiener, *Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation* (1983) 20 San Diego L.Rev. 233), "With this precedential foundation it might readily have been anticipated that only nine years later *Ultramares* would have been decided in a similar fashion. However, Cardozo's anxiety over the implications of creating liability in an indeterminate sum for an indeterminate class of potential plaintiffs was apparently sufficient to deter him from extending liability on negligence grounds, particularly where plaintiffs had redress for deceit. [Fn. omitted.] In distinguishing *Glanzer,* he referred to the weigher's certificate which was the 'end and aim of the transaction,' [fn. omitted] contrasting that with potential liability for those only incidentally or remotely involved in the accountant-client relationship. Thus, even with the recognition that '[t]he assault upon the citadel of privity is proceeding in these days apace,' [fn. omitted] the *Ultramares* court in denying recovery jumped from what they perceived to be the economically devastating 'slippery slope' of *Glanzer* and retreated to the safer ground of privity. [Fn. omitted.]" *(Id.,* at pp. 243-244.)

Whether *Glanzer* and *Ultramares* both urge an "end and aim" test is not controlling, although the seeming inconsistency of the opinions lends credence to the view they do not. *Ultramares* was clearly based upon a social utility rationale which has been followed under the privity doctrine or some modification thereof. Section 552 of the Restatement Second of Torts[2]

---

[2]Section 552 of the Restatement Second of Torts reads:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

adopts a limited approach to liability; however, it rejects *Ultramares'* requirement of privity, settling instead on the reasoning of *Glanzer* in requiring "knowing reliance." (See *Rusch Factors, Inc.* v. *Levin* (D.D.C. 1968) 284 F.Supp. 85.) One of the bases for the Restatement rule as stated in the comment[3] and by others is the reluctance of courts to impose liability for pecuniary loss alone absent privity. (See Note, *H. Rosenblum, Inc.* v. *Adler:* A *Foreseeably Unreasonable Extension of an Auditor's Legal Duty* (1984) 48 Albany L.Rev. 876; Note, *Public Accountants and Attorneys: Negligence and the Third Party* (1972) 47 Notre Dame Law. 588.) California courts long ago breached that unreasonable distinction as far as negligence is concerned. (See *Biakanja* v. *Irving, supra,* 49 Cal.2d 647; *Lucas* v. *Hamm, supra,* 56 Cal.2d 583; *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60].)

Butler claims that basic differences between the accounting profession and others require a more limited rule of liability, whether it be the rule of *Ultramares* or the Restatement. While manufacturers, attorneys, architects, doctors, and the like control their products and their records, the accountant does not control his client's records, nor does the accountant control the client's use of the audit product. Further, other professionals do not expose themselves or their services to the public for review and possible reliance. He points out in reality just the opposite occurs. The lawyer's duty generally is to his or her client only. (But see *Heyer* v. *Flaig, supra,* 70 Cal.2d 223.) However, such duty is recognized in ethical as well as legal obligations of confidentiality. Further, an attorney's duty is to represent the client to the best of his or her ability without regard to public opinion; so too the medical practitioner, whose duty of care is easily traced to the patient. The same relationship generally exists between all other professionals and their clients. Not so an accountant. (See Note, *H. Rosenblum, Inc.* v. *Adler: A Foreseeably Unreasonable Extension of an Auditor's Legal Duty, supra,* 48 Albany L.Rev. 876; Comment, *Accountants' Liability to the Third Party and Public Policy: A Calabresi Approach,* 39 Sw. L.J. 689; Gormely, *The Foreseen, The Foreseeable, and Beyond—Accountants' Liability to Nonclients* (1984) 14 Seton Hall L.Rev. 528.)

---

[3]Comment (a) of section 552 of the Restatement Second of Torts reads: "Although liability under the rule stated in this Section is based upon negligence of the actor in failing to exercise reasonable care or competence in supplying correct information, the scope of his liability is not determined by the rules that govern liability for the negligent supplying of chattels that imperil the security of the person, land or chattels of those to whom they are supplied (see §§ 388-402), or other negligent misrepresentation that results in physical harm. (See § 311). When the harm that is caused is only pecuniary loss, the courts have found it necessary to adopt a more restricted rule of liability, because of the extent to which misinformation may be, and may be expected to be, circulated, and the magnitude of the losses which may follow from reliance upon it. . . ."

This criticism seems to misunderstand the role of the accountant. An independent auditor (as opposed to an in-house accountant) is employed to analyze a client's financial status and make public the ultimate findings in accord with recognized accounting principles. Such an undertaking is imbued with considerations of public trust, for the accountant must well realize the finished product, the unqualified financial statement, will be relied upon by creditors, stockholders, investors, lenders or anyone else involved in the financial concerns of the audited client. As stated in the AICPA (American Institute of Certified Public Accountants), Prof. Standards, Code of Prof. Ethics (CCH 1984) ET section 51.04 (1981), "The ethical Code of the American Institute [of Certified Public Accountants] emphasizes the profession's responsibility to the public, a responsibility that has grown as the number of investors has grown, as the relationship between corporate managers and stockholders has become more impersonal, and as government increasingly relies on accounting information." Chief Justice Burger, writing for a unanimous United States Supreme Court in *United States* v. *Arthur Young & Co.* (1984) 465 U.S. 805 [79 L.Ed.2d 826, 104 S.Ct. 1495], described the role of the independent auditor, "[a]n independent certified public accountant performs a different role. ■ By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations." (*Id.,* at pp. 817-818 [79 L.Ed.2d at p. 836, 104 S.Ct. at p. 1503].)

■ The auditor must, by necessity, be independent of the client. Unlike a manufacturer who guarantees a product's safety, the accountant does *not* guarantee that the client's financial statements are completely true and without fault. The accountant's audit certification merely guarantees that the financial statements fairly present the firm's financial position in compliance with generally accepted accounting principles (GAAP). The professional standards of the AICPA express the auditor's function as follows: "The objective of the ordinary examination of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles." (AICPA, Prof. Standards, vol. A (CCH 1984) § 110.01, p. 61.) The AIC-

PA has promulgated reporting standards which govern the preparation of financial statements:

"1. The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

"2. The report shall state whether such principles have been consistently observed in the current period in relation to the preceding period.

"3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

"4. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's examination, if any, and the degree of responsibility he is taking." (AICPA, Prof. Standards, Vol. A, *supra*, § 150.02, pp. 81-82.) Thus, in issuing an opinion, the auditor is guaranteeing only that the numbers comply with the AICPA's standardized accounting rules and procedures, the GAAP. Further, the auditor is guaranteeing that he tested for GAAP compliance using generally accepted auditing standards (GAAS). The auditor is not guaranteeing the client's records and resulting financial statements are perfect; only that any errors which might exist could not be detected by an audit conducted under GAAS and GAAP. Thus, the auditor's degree of control over the client's records is unimportant; the auditor need only control his or her abilities to apply GAAS and GAAP to a given audit situation.

 Under a foreseeability standard, the auditor would be liable only to those third parties who reasonably and foreseeably rely on the audited statements. The accountant's lack of control over ultimate users is not prejudicial; the foreseeability standard holds everyone, including accountants, liable to only reasonably foreseeable users. (E.g., *MacPherson* v. *Buick Co.*, *supra*, 217 N.Y. 382 [111 N.E. 1050] (car manufacturer); *J'Aire Corp.* v. *Gregory, supra*, 24 Cal.3d 799 (general contractor); *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] (psychiatrist); *Biakanja* v. *Irving, supra*, 49 Cal.2d 647 (notary public); *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] (tool manufacturer); *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278 [136 Cal.Rptr. 603] (architects); *M. Miller Co.* v. *Dames & Morre*

(1961) 198 Cal.App.2d 305 [18 Cal.Rptr. 13] (engineers); *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] (physicians); *Lucas* v. *Hamm, supra,* 56 Cal.2d 583 (attorneys).) It is only reasonable that the same judicial criteria govern the imposition of negligence liability, regardless of the defendant's profession.

We note that other jurisdictions have already held accountants to the same standard of negligence liability as other professionals. In *Rosenblum* v. *Adler* (1983) 93 N.J. 324 [461 A.2d 138, 35 A.L.R.4th 199], faced with almost the exact scenario before us, the Supreme Court of New Jersey stated, "[c]ertified financial statements have become the benchmark for various reasonably foreseeable business purposes and accountants have been engaged to satisfy those ends. In those circumstances accounting firms should no longer be permitted to hide within the citadel of privity and avoid liability for their malpractice. . . . Defendants' ignorance of the precise use to which the statements would be put does not eliminate their obligation. . . . [I]t is necessary only that Giant, the entity for whom the audit was being made, used it for a proper business purpose. There was no limitation in the accountants' opinion. They could reasonably expect that their client would distribute the statements in furtherance of matters relating to its business. Having inserted the audit in that economic stream, the defendants should be responsible for their careless misrepresentations to parties who justifiably relied upon their expert opinions." (*H. Rosenblum, Inc.* v. *Adler, supra,* 461 A.2d at pp. 153-155.) In *Citizens State Bank* v. *Timm, Schmidt & Co.* (1983) 113 Wis.2d 376 [335 N.W.2d 361], the court reversed a summary judgment granted on the basis no duty was owed by the defendant accountant to the unknown third party plaintiff who had relied on an audited financial statement prepared by the defendant. The court rejected defendant's reliance on the Restatement Second of Torts, section 552. "Although the absence of privity does not bar this action, the question remains as to the extent of an accountant's liability to injured third parties. Courts which have examined this question have generally relied upon section 552 of the Restatement to restrict the class of third persons who could sue accountants for their negligent acts. Under section 552(2)(a) and (b), liability is limited to loss suffered. . . . [Citation.] The fundamental principle of Wisconsin negligence law is that a tortfeasor is fully liable for all foreseeable consequences of his act except as those consequences are limited by policy factors. . . . [Citation.] The Restatement's statement of limiting liability to certain third parties is too restrictive a statement of policy factors for this Court to adopt." (*Id.,* at pp. 365-366.)

We have determined the protectionist rule of privity announced in *Ultramares* is no longer viable, for the role of the accountant in our modern

society has changed. At the time of *Ultramares,* the primary obligation of the auditor was to the client who hired him or her to detect fraud or embezzlement by the client's employees. ■ As explained earlier, the accountant (independent auditor) today occupies a position of public trust. (See AICPA, Prof. Standards, Code of Prof. Ethics, *supra,* ET § 51.04.) We also find the Restatement limitation of liability to those "he intends to supply the information or [to those he] knows that the recipient intends to supply it" (Rest.2d Torts, *supra,* § 552) does not meet California's concept of tort liability for negligence.

It is our view tort liability should be delimited only by the concept of foreseeability and we refuse to accept the premise that absent duty a person is free to be as negligent as they choose. California Civil Code section 1714, subdivision (a), provides: "Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. . . ." Our Supreme Court in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] adopted such a concept. "California cases have occasionally stated a similar view: 'All persons are required to use ordinary care to prevent others being injured as the result of their conduct.' [Citations.] Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy. [Citations.]" (*Id.,* at p. 112.)

■ An innocent plaintiff who foreseeably relies on an independent auditor's unqualified financial statement should not be made to bear the burden of the professional's malpractice. The risk of such loss is more appropriately placed on the accounting profession which is better able to pass such risk to its customers and the ultimate consuming public. By doing so, society is better served; for such a rule provides a financial disincentive for negligent conduct and will heighten the profession's cautionary techniques.

Thus, we find no societal considerations sufficient to create an exception to California's well established general principles of tort liability. We hold an independent auditor owes a duty of care to reasonably foreseeable plaintiffs who rely on negligently prepared and issued unqualified audited financial statements. Having so determined, the summary judgment must be re-

versed. A question of fact exists as to whether IMC's reliance was reasonably foreseeable and, if so, whether Butler breached the resulting duty. That determination is for the trial court.

The judgment is reversed.

Wallin, J., and Sonenshine, J., concurred.

A petition for a rehearing was denied March 21, 1986, and the judgment was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied May 29, 1986. Mosk, J., Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.