813 So.2d 964 (2002)
NATIONSBANK, N.A.; Bankboston, N.A.; and Southtrust Bank, N.A., Appellants,
v.
KPMG PEAT MARWICK LLP, Appellee.
No. 4D00-3509.
District Court of Appeal of Florida, Fourth District.
February 20, 2002.
Rehearing Denied May 13, 2002.
*965 Marc Cooper and Maureen E. Lefebvre of Colson, Hicks, Eidson, Coral Gables, and Kozyak Tropin & Throckmorton, P.A., Miami, for appellants.
Edward A. Marod of Edward A. Marod, P.A., West Palm Beach, and Elizabeth V. Tanis, Amelia Toy Rudolph and Deena R. Bernstein of Sutherland Asbill & Brennan, LLP, Atlanta, Georgia, for appellee.
FARMER, J.
In this business tort case a jury returned a mixed verdict, and after trial the court adjusted the jury's award with setoffs. In this opinion we address only the issues of whether a party not in privity can sue the maker of negligent misrepresentations and whether the trial court erred in granting the setoffs, affirming on all other issues.
Although the trial took ten weeks, the following facts suffice for our discussion. NationsBank, Bank Boston, and South Trust Bank, ("Banks") entered into a line of credit agreement with a Boca Raton marketer of brand name fragrances ("Borrower"). The loan was secured by all of Borrower's assets. Under the line of credit, Borrower could borrow funds for operating capital according to a specified percentage of certain inventory and accounts receivable. Over the years, the balance owing on the line of credit increased from an initial maximum of $12 million in 1990 to $55 million by the end of 1994.
In order to determine Borrower's true financial condition, as well as its inventory and receivables in any fiscal year, Borrower was required to furnish Banks with an annual audited financial statement. In turn Banks relied on Borrower's audited financial statements to decide whether to renew, increase or call the amount of the line of credit, based on the financial condition of Borrower reflected in the annual statement. KPMG had been Borrower's outside independent auditor since well before the Banks opened the line of credit and was thereafter responsible for preparing Borrower's audited financial statements during the existence of the line of credit. KPMG's engagement partner supervising the account testified that "early on" he read the line of credit agreement and understood the necessity and the requirement for the annual financial statements.
Thereafter KPMG performed audits of Borrower for the fiscal years 1991 through 1994. During these years, Borrower was profitable and grew rapidly, with its growth partially aided by funds lent by Banks. In November 1994, however, Borrower asked Banks to consider increasing the line of credit under the lending agreement to $65 million. Banks conditioned an increase on a review of Borrower's 1994 audited financial statement. Upon a review of the audited financial statements of Borrower prepared by KPMG, Banks decided against lending Borrower any more money. After sales in the fragrance market turned rancid, marked by an especially dismal Christmas season, Borrower reported a $20 million loss for 1995. Consequently Borrower sought relief in the Bankruptcy Court under chapter 11.
Banks filed proofs of claim showing that Borrower was indebted under the line of credit for $42 million, that Borrower was in default, and that the debt was secured by Borrower's inventory and receivables. As a result of sale of collateral, Banks' claim in the Bankruptcy case ultimately shrank. Banks' unsecured $19 million claim was ultimately allowed by the Bankruptcy Court.
Borrower proposed a plan of reorganization under the Bankruptcy Code. The plan called for a liquidating trust agreement *966 between Banks, Borrower, the unsecured creditors and an outside trustee. Borrower assigned all of its remaining assets to the trustee, and the trustee proceeded to liquidate assets to pay unsecured claims. Among the assets in the hands of the trustee was a disputed claim of the Borrower against its auditors, KPMG. The trust agreement provided that any recoveries by the trustee were to be allocated between the other unsecured creditors and Banks on the basis of their respective percentages of allowed unsecured claims. The Bankruptcy Court confirmed the plan, including the liquidating trust agreement.
Banks and the trustee joined together in filing an action in state court against KPMG. Banks claimed that the KPMG audited financial statements for certain years were inaccurate and failed to correctly reflect Borrower's "precarious financial condition," and that Banks had relied on the statements in question. For its claim, the trustee alleged that KPMG negligently performed the annual audits for the years 1991-1994, to the Borrower's detriment. The case proceeded to trial. At appropriate times, KPMG moved for a directed verdict on Banks' claim of negligent misrepresentation. KPMG argued that Banks failed to present evidence establishing that when it performed the audits in question, KPMG knew that Banks intended to rely on KPMG's audits, and that KPMG intended such reliance. KPMG argued that such a showing was required in a negligent misrepresentation case against an accountant by a non-client. The trial court denied KPMG's motions.
The jury returned a verdict finding no liability on the trustee's claim of negligent performance of the audits. As to Banks' claim for negligent misrepresentation, however, the jury found liability and apportioned comparative fault between KPMG and Banks. Specifically, the jury found that the auditors were 26% liable and that the total loss was $19 million. Accordingly the actual damages awarded to Banks after reduction for comparative fault was $4.9 million.
After trial KPMG moved for a setoff against Banks' verdict, claiming that the judgment should be reduced as a result of settlements received by the trustee in connection with certain claims brought by the trustee on behalf of the estate. The motion specifically identified the following settlements: (1) $1 million from Borrower's president, chairman and majority shareholder; (2) $999,000 from certain directors and officers of Borrower; (3) $2.1 million from General Perfumes; (4) $450,000 from Fragrance Plus of Texas and others; (5) $1,500,000 from French Fragrance; (6) $149,000 from Cosmetics Plus; and (7) $40,000 from General Perfume of California. After a hearing, the trial granted setoffs in the amount of $4,549,000, thereby reducing Banks' overall recovery to $391.000.[1] With this essential background, we turn to a discussion of the issues we deem notable.
Turning first to the issue of the motion for directed verdict, we address the necessary ingredients for a third party claim of negligent misrepresentation against an accounting firm. Banks' claim against their borrower's auditor falls squarely under the Supreme Court's decision in First Florida Bank, N.A. v. Max Mitchell & Co., 558 So.2d 9 (Fla.1990). There the court determined that claims against accounting firms for negligent misrepresentation are within the ambit of section 552 of the Restatement (Second) of *967 Torts.[2] As relied on in Max Mitchell, section 552 provides in relevant part:
"(1) One who, in the course of his business...supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
"(2) ... [T]he liability stated in Subsection (1) is limited to loss suffered: (a) by the person or one of a limited group of persons for whose benefit and guidance he... knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he... knows that the recipient so intends or in a substantially similar transaction."
558 So.2d at 12. In explaining its adoption of section 552, the court said:
"liability should extend not only to those with whom the accountant is in privity or near privity, but also to those persons, or classes of persons... whom he knows his client intends will so rely. On the other hand, as the commentary makes clear, [section 552] prevents extension of liability in situations where the accountant `merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon [the audited financial statements], on the part of anyone to whom it may be repeated.' Restatement (Second) of Torts § 552, Comment h. As such it balances, more so than the other standards, the need to hold accountants to a standard that accounts for their contemporary role in the financial world with the need to protect them from liability that unreasonably exceeds the bounds of their real undertaking." [e.s.]
558 So.2d at 15-16. Comment h, cited by the court in the above quotation, says in part that the negligent maker of a misrepresentation is liable if he "knows that his recipient intends to transmit the information to a similar person, persons or group." Thus section 552 does not always require a maker of a negligent misrepresentation himself to intend reliance by the third person; it is sufficient if the maker knows that his client will give the information to another who will rely on it in making a business decision.
As we indicated earlier, the evidence at trial showed that the KPMG executive who was responsible for Borrower's account with the accounting firm had read the line of credit agreement and had taken specific note of the requirement that Borrower furnish Banks with annual audited financial statements. These annual statements *968 could only have come from an outside auditor, such as KPMG. Thus the jury could have determined from the evidence that the account executive, and therefore KPMG itself, knew from their annual audits of Borrower's records the importance of the line of credit to Borrower's business, and that Banks would rely on the audited financial statements in making their annual decisions whether to maintain, extend or call the line of credit.
The account executive and his firm could not have been unaware of the role that a $55 million line of credit meant for Borrower's continued operation. After all, they were the auditors of Borrower's books and therefore had unusually detailed knowledge of all phases of its operation. The jury could have found from the facts that Borrower was obligated to furnish audited financial statements to its lenders, that Borrower was requesting (and paying for) an annual audited financial statement, that KPMG knew that Borrower was furnishing the lenders with the very audited financial statements that KPMG annually prepared, and that Banks were relying on the audited financial statements in their annual review of Borrower's line of credit. That knowledge plainly satisfies the requirements of section 552 as to "[a] class of persons... whom he knows his client intends will so rely [e.s.]."[3] Contrary to the argument of KPMG, Banks offered sufficient evidence for a prima facie case that KPMG had actual knowledge of Banks' reliance on the annual audited financial statements in deciding whether to continue the line of credit.[4]
We also have no doubt that the term "transaction" in section 552(2)(b) encompasses Borrower's line of credit with Banks. As comment j to section 552 states,
"Under this Section, the liability of the maker of a negligent misrepresentation is limited to the transaction that he... knows that the recipient intends, to influence, or to a substantially similar transaction."
Indeed one of the supporting illustrations in comment j involves a line of credit by a lender and a borrower who obtains an audited financial statement to influence the lender. The fact that the line of credit between Borrower and the lender banks was not a one-time transaction but an ongoing one does not mean that the annual reviews of the line of credit by the lender, and the concomitant annual decision whether to renew or extend or call the line, necessarily involved different transactions. Section 552's use of the term "transaction" is broad enough to encompass an ongoing transaction such as the one involved in this case, where the line of credit was established by action of the parties in 1990 and was intended by them to be reviewed for continuation or termination in future years. Accordingly we find no error in the trial court's denial of the motion for directed verdict.
*969 Next we consider the setoffs. They appear to arise from settlements of claims brought by the trustee, along with Banks, against third parties indebted to both Borrower and Banks. In allowing these setoffs, the trial court relied on section 768.041(2), Florida Statutes (2000), and our own decision in Raben Builders, Inc. v. First American Bank & Trust Co., 561 So.2d 1229 (Fla. 4th DCA 1990). Section 768.041(2) allows such a setoff only if the person claiming it shows that the amount claimed to be setoff was paid "in partial satisfaction of the damages sued for" by the nonsettling party against whom the setoff is claimed.[5] In Wells v. Tallahassee Mem. Reg. Med. Center, Inc., 659 So.2d 249 (Fla.1995), the supreme court held that setoffs are allowed under section 768.041 only for payments made "in partial satisfaction of the damages sued for" by the nonsettling defendant. In short, only payments made by joint tortfeasors, i.e., persons jointly liable with the nonsettling defendant, qualify for a setoff under section 768.041.[6]
The precise nature of these claims by the trustee against the third parties is not elucidated by any party to this appeal, but it seems they all arose out of Borrower's business affairs. So far as we can tell, the allowed setoffs seem to fall into two classes. The first class is made up of debts owed by insiders and other officers of Borrower.[7] The second class is made up of debts owed by purchasers of product who had an account with Borrower.[8] While Banks may have been able to make claims directly against both classes by reason of Banks status as a creditor holding a security interest in property of Borrower, i.e. for corporate property of the debtor in the hands of its insiders or as accounts receivable, that fact would hardly make KPMG jointly liable with these classes as regards Banks.
Banks therefore argue that these settlements came from parties who may have been severally liable with KPMG to both Borrower and Banks, but they were not jointly liable. In response KPMG recognizes that joint liability may be required for a setoff under section 768.041 but argues that this is a case of joint liability. The KPMG theory of joint liability comes from our decision in Slawson v. Fast Food Enterprises, 671 So.2d 255 (Fla. 4th DCA 1996). Slawson involved the meaning of section 768.81, a statute that adopted the doctrine of "comparative fault" and to that extent bars the use of joint and several *970 liability.[9]
Section 768.81(4) specifies that comparative fault applies only to "negligence cases," however, and goes on to provide:
"In determining whether a case falls within the term `negligence cases,' the court shall look to the substance of the action and not the conclusory terms used by the parties."
In Slawson, we held that comparative fault does not apply when the action for negligence is based on an intentional tort. KPMG argues that Banks' action for negligent misrepresentations against KPMG is based on an intentional tort, namely alleged defalcations by certain insiders of Borrower.
We reject KPMG's argument. The negligent misrepresentation claim is not founded on an intentional tort. At best, it may be said to involve the failure of the auditors to report the true financial condition of Borrower, which condition may have been affected by defalcations of some insiders but, equally, may have been affected by merely negligent conduct. Simply because some intentional misconduct may have affected Borrower's financial condition does not mean that the auditors' mistakes in reporting that condition are based on intentional misconduct.
We also note that KPMG did not occupy the same relationship with Banks that Burger King occupied with respect to its patron in Slawson. The restaurant owed a duty to its patron to protect her from the intentional misconduct of other patrons. KPMG owed a duty to the Banks to report accurately what Borrower's audited records disclosed.
In no sense can it be said that Banks' claim is based on the intentional misconduct of anyone. As we said in Slawson: "the issue is whether an action comprehending one or more negligent torts actually has at its core an intentional tort by someone." 671 So.2d at 258. The tort of negligent misrepresentation could well involve nothing but negligence, with no basis of intentional misconduct by anyone. Borrower's affairs could have been merely negligently managed by its officers and directors, without any defalcation by anyone, and KPMG's misrepresentations could have simply overstated some inventory, or missed some bad debts. Because the negligence claim here was not based on an intentional tort, the exceptions to the abrogation of joint and several liability in section 768.81 are not applicable here.
KPMG's debt to Banks for negligent misrepresentations was manifestly not a debt as to which the former officers of Borrower or its customers have been shown to be jointly liable. All that KPMG showed the trial court is that the settlements represented obligations in which KPMG was severally liable at best. Accordingly, as we understand Wells, it supplants our decision in Raben to the extent of any inconsistency with Wells. Hence there is no showing that the parties settling with the trustee paid money "in partial satisfaction of the damages sued for" by Banks.[10]
*971 Returning therefore to section 768.041(2) and its construction by the Wells court, it is apparent to us that KPMG was required to support its claim to setoffs on a showing that the recoveries from the designated settlements were joint obligations with its debt for negligent misrepresentations. The record fails to contain any showing of joint obligations. KPMG has therefore failed to demonstrate an entitlement to setoffs for joint liability as required by section 768.041.
We therefore reverse the setoffs in their entirety. We affirm on all other issues.
STEVENSON, J., and OWEN, WILLIAM C., JR., Senior Judge, concur.
NOTES
[1] In sum the trial court recognized for setoff purposes the settlements of claims (1), (2), (3) and (4), but rejected settlements (5), (6) and (7).
[2] Actually, what the court said in Max Mitchell as to its use of section 552 was:

"Upon consideration, we have decided to adopt the rationale of section 552... as setting forth the circumstances under which accountants may be held liable in negligence to persons who are not in contractual privity." [e.s.]
558 So.2d at 14. Seven years later, however, in Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 334 (Fla.1997), the court again considered section 552 in a negligent misrepresentation case, this time brought by a buyer of land against his seller for a misleading appraisal given to induce the purchase. Once again the court decided to use section 552 to supply the rule of liability, saying that: "we adopt the Restatement['s] ... position [e.s.] on negligent misrepresentation contained in section 552."
Thus on the one hand in Max Mitchell the court adopted the "rationale [e.s.] of section 552," while in Gilchrist the court adopted the "position [e.s.] ... on negligent misrepresentation contained in section 552." Whether the rationale of section 552 is something different than the position of section 552, and whether either or both is something different than the substance or text of section 552, is something we need not resolve today.
[3] See comment h ("It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group.").
[4] See also Int'l Mortgage Co. v. John P. Butler Accountancy Corp., 177 Cal.App.3d 806, 814, 223 Cal.Rptr. 218, 222 (4th Dist.1986) ("Further, audited financial statements are not confidential information for the client only, but are instead investigatory reports for possible, if not probable, public use in the business world.").
[5] See § 768.041(2), Fla. Stat. (2000) ("At trial, if any defendant shows the court that the plaintiff ... has delivered a release or covenant not to sue to any person, firm, or corporation in partial satisfaction of the damages sued for, [e.s.] the court shall set off this amount from the amount of any judgment to which the plaintiff would be otherwise entitled at the time of rendering judgment and enter judgment accordingly."); see also § 46.015(2), Fla. Stat. (2000) ("At trial, if any person shows the court that the plaintiff... has delivered a written release or covenant not to sue to any person in partial satisfaction of the damages sued for [e.s.], the court shall set off this amount from the amount of any judgment to which the plaintiff would be otherwise entitled at the time of rendering judgment.").
[6] See § 768.041(1), Fla. Stat. (2000) ("A release or covenant not to sue as to one tortfeasor for property damage to, personal injury of, or the wrongful death of any person shall not operate to release or discharge the liability of any other tortfeasor who may be liable for the same tort [e.s.] or death."); see also Wells, 659 So.2d at 253 ("Of course, the setoff statutes do apply to economic damages for which parties continue to be subject to joint and several liability.").
[7] Settlements (1) and (2) appear to be in this class.
[8] Settlements (3) and (4) appear to be in this class.
[9] See § 768.81(3), Fla. Stat. (2000) ("In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability, except as provided in paragraphs (a), (b), and (c)...."). None of the exceptions apply in this case.
[10] The allowed setoffs came from settlements as to certain claims asserted by the trustee and Banks under the plan of reorganization on behalf of the estate against various third parties. The amounts recovered from these settlements apparently became property of the bankruptcy estate and were then allocated under the confirmed plan of reorganization to the unsecured creditors according to their respective percentages of all allowed unsecured claims. Thus Banks may have received some of the funds resulting from settlements, but only so much as their unsecured claim represented among all unsecured claims. Consequently even if any setoff were allowable, the amount of such setoff would surely be less than the amount actually paid by the settling party.